Argued February 10; affirmed March 21, 1933.

MUNSON *v.* STATE INDUSTRIAL ACCIDENT
COMMISSION

(20 P. (2d) 229)

*Miles H. McKey,* Assistant Attorney General (I.
H. Van Winkle, Attorney General, on the brief), for
appellant.

*Borden Wood* and *Theodore Opsund,* both of Port-
land (C. L. Starr and Ralph H. King, both of Portland,
on the brief), for respondent.

CAMPBELL, J. Perry L. Munson was employed
by the State Highway Commission in the capacity of

foreman of a fence crew, working in certain districts throughout the state. The employer and employee were contributors to, and operated under the provisions of, the Workmen's Compensation Act.

During the week ending August 15, 1930, Munson's crew was working in the vicinity of Springdale, located about 26 miles east of Portland on the upper Columbia river highway.

Among other duties, Munson was required to make weekly reports to the district resident engineer whose office for that district was at McMinnville, Oregon. These reports contained the time of himself and his crew, progress of work, supplies and materials consumed in the work and memoranda of purchases. With the exception of two occasions while working in the district over which the engineer at McMinnville had control, Munson delivered his reports to that office in person while on the way to his home in Rockaway, Oregon. The trip was always made in an automobile belonging to Herbert F. March, a member of Munson's crew and who also lived in Rockaway.

After the completion of the week's work on Friday, August 15, 1930, about 4:10 p. m., Munson was traveling in March's car on his way to Rockaway via McMinnville, at which latter place he was planning to deliver his weekly reports. While on the Base Line road, and before he reached Portland, an accident occurred in which Munson sustained fatal injuries, dying five days later. The route traveled was the direct way to his home.

Munson's widow, plaintiff herein, filed a claim with the State Industrial Accident Commission, which claim was rejected by the said Commission on the ground that the injuries sustained did not arise out of and in the course of employment.

An appeal was taken from the findings of the Commission, to the circuit court for Multnomah county where the case was tried to a jury. After all the evidence was in, both sides requested a directed verdict. The jury was discharged and the court entered findings of fact and conclusions of law in favor of plaintiff upon which judgment was entered. Defendant appeals.

It is conceded that deceased died as the result of a personal injury caused by violent or external means. Appellant has specified ten assignments of error, yet the only question presented by the record is, did the injuries sustained, "arise out of and in the course of the employment"?

It appears from the record, that throughout the entire course of employment of deceased with the State Highway Commission he delivered his weekly reports in person to the district office of that district in which he happened to be working at the time and that the employer acquiesced in that method of delivery. *Walters v. Dock Commission*, 126 Or. 487 (266 P. 634, 270 P. 778). These reports were required to be made out at the end of each week and could only be made out after the week's work of 48 hours had actually been completed.

Mr. Davies, the office-man in the resident engineer's office at McMinnville, on cross-examination testified:

"Q. Under the practices out of your office, when would the report of a crew whose week ended Saturday night have to be submitted? Could it be submitted at any time before the close of the week?

"A. So it got there about Monday or Tuesday.

"Q. Could it be prepared before the close of the week?

"A. No.

"Q. The final form?

"A. The final form would be completed at the end of the week they worked. In other words, they could not complete their time until they had actually worked it".

These reports were required to be in the office of the district engineer promptly in order to facilitate the making up of the pay roll.

He also testified that though the rest of the foremen generally mailed their reports in, they sometimes delivered them personally as they came by the office.

Mr. Eason, the district engineer, and one of appellant's witnesses, testified that it was never understood between him and decedent that the reports were to be sent by mail.

"Q. But it was it understood that it had to come by mail, was it?

"A. It is generally understood.

"Q. I am asking you if it was ever understood between you and Mr. Munson that that report had to come by mail?

"A. Well, I didn't demand it, no.

"Mr. King: Would you kindly read the question, Mr. Reporter?

"(The question was read.)

"A. No".

Mr. Tate, the third member of the crew that was in the party, at the time the accident occurred, testified in effect that it was the practice of Mr. Munson to deliver the reports in McMinnville personally. He further testified that when the crew were working at Salem, "coming home from Salem, we went around by Mc-Minnville and delivered the reports; and as we went back, we went by the Dallas cut-off, which is ten miles shorter"; that Mr. Munson had a report with him at the time of the accident on August 15, 1930.

Mrs. Munson, wife of decedent, and respondent herein, testified, on direct examination, that when deceased worked in the Tillamook district, with the district headquarters located at Tillamook, it was the custom of deceased to deliver the reports to the office of the resident engineer at Tillamook. The work in that district, in some instances, was carried on north of Rockaway, which necessitated decedent to pass through Rockaway, where his home was located, to Tillamook to deliver the reports and retrace his route back to Rockaway, thus causing him to go out of his way.

Thus, the evidence seems to be sufficient to uphold respondent's contention that a strong inference might reasonably be drawn that deceased would have delivered the reports personally, regardless of where he would have been working in the state, to the head office of a particular district, without thought as to how far such a procedure would take him out of his homeward route. The uncontradicted evidence is that there were no instructions given him as to how he should deliver the reports.

■ The adjudicated cases of this state and of other states would appear to be in hopeless confusion, yet a careful analysis of the facts and circumstances of each of those cases will show that they all may be practically reconciled.

" 'In determining whether an accident arose out of and in the course of the employment, each case must be decided with reference to its own attendant circumstances, and it has indeed been stated rather broadly, but by eminent authority that argument by analogy is valueless'. Corpus Juris, (W. C.) p. 73''. 1 Schneider, Workmen's Compensation Law (2d Ed.), p. 741, § 262.

Counsel for appellant relies strongly on what he refers to as the "New York Rule", as laid down by that

eminent jurist, Judge Cardozo, in the *Matter of Mark v. Gray,* 251 N. Y. 90 (167 N. E. 181), decided May 28, 1929. This was a case where decedent was a plumber's helper. On one occasion, it was necessary for him to make a special trip in his own car, entirely upon his private affairs. His master, hearing of the trip, requested him to take some tools with him and make a trifling repair to some water faucets in a building in the town to which he was going. Before reaching the town, he met with a fatal accident for which his widow sought compensation from the Industrial Accident Board. The case finally reached the court of appeals where it was determined that the injury,

"Did not arise 'out of and in the course of' any service that Marks had been employed to render. He was not making the journey   *   *   *   at the request of his employer or for the purpose of doing his employer's work. He was making it in fulfillment of a promise to call for his wife at the end of the day.   *   *   * Many cases there are in which the perils of travel *  *  * are so related to the employment as to lay the basis for an award.   *   *   *   We have no thought to detract from these decisions or to whittle down by exceptions the principle beneath them.   *   *   *   What concerns us here is whether the risks of travel are also risks of the employment. In that view, the decisive test must be whether it is the employment or something else that has sent the traveler forth upon the journey or brought exposure to its perils.   *   *   *   We do not say that service to the employer must be the sole cause of the journey, but at least it must be a concurrent cause. To establish liability, the inference must be permissible that the trip would have been made though the private errand had been canceled".

In an earlier case, in the *Matter of Grieb v. Hammerle,* 222 N. Y. 382 (118 N. E. 805, 7 A. L. R. 1075), the same learned jurist said:

"If Grieb had been injured during working hours it would make no difference that his service was

gratuitous. If the service was incidental to the employer's business and was rendered at the employer's request it would be part of the employment within the meaning of this statute. Any other ruling would discourage helpful loyalty. * * * We have already held that in determining the relation of employer and employee the payment of wages is not the sole test. * * * It is plain, therefore, that Grieb's service, if it had been rendered during working hours would have been incidental to his employment. To overturn this award, it is necessary to hold that the service ceased to be incidental because rendered after hours. That will never do. The law does not insist that an employee shall work with his eye upon the clock. Services rendered in a spirit of helpful loyalty, after closing time has come, have the same protection as the services of the drone or the laggard''.

The above is a case where the servant returned to the master's place of business, sometime after working hours, and found the master preparing some packages for delivery. The master asked him if he would kindly deliver the packages; this the servant undertook to do. In going down a stairway, he fell and was fatally injured and a claim was presented for the injury to the Industrial Accident Board.

In *Pigeon's Case*, 216 Mass. 51 (102 N. E. 932, Ann. Cas. 1915A, 737), the court held:

''As has been pointed out, there was evidence to the effect that it was decedent's duty to water the horse, and that he was on his way to perform that duty at the time of the injury. Though he may have had at the same time, the purpose to do something else * * * after watering the horse, that fact does not prevent the service actually rendered at the moment from being in the course of his employment''.

This is a case where the servant was given custody of the master's horse. It was his duty to take care of

the master's horse as well as drive it. He was instructed to water the horse when he had an opportunity. At the noon hour, without authority, he was accustomed to take the horse home and, on his way, water it at a watering trough. His home was some distance beyond the site of the watering trough, though in the same direction. On the day of the accident on his way home, but before reaching the watering trough, decedent was fatally injured by the running away of the horse. A claim was presented to the Industrial Accident Board which was allowed and upheld by the Massachusetts Supreme Court.

It would serve no useful purpose to analyze and distinguish all of them; but, as we say, the cases are numerous and divers. Those who wish to follow the matter further will find them collated very extensively in chapter 6, 1 Schneider Workmen's Compensation Law (2d Ed.), beginning at page 734.

■ In the instant case, it was the duty of decedent to make out his reports and to deliver them to the resident engineer at McMinnville either by mailing them or by delivering them in person. The evidence shows that during all the time the decedent worked for the Highway Commission he delivered his reports personally to his resident engineer. During the time he worked for the Highway Commission in the district which comprised Tillamook and other coast counties, with the resident engineer located at Tillamook, he followed the same custom, although on some occasions he had to go past his home to make the delivery.

When he was transferred to District No. 2, comprising Marion, Clackamas and Multnomah counties, with the resident engineer located at McMinnville, he

followed the same custom. When working south of McMinnville, he would detour so as to deliver the report in person.

There can be no question that making the report and delivering it arose out of and in the course of his employment, and when he delivered it personally and in the same manner all through his employment his employer adopted and ratified the mode of delivery. Especially is that true in the instant case when the record discloses that he was not directed to deliver the report in any other way.

At the time of the injury, he was engaged in forwarding and facilitating his master's business, and as said by Justice Cardozo in the Grieb case, "Any other ruling would discourage helpful loyalty".

The judgment of the lower court should be affirmed.

It is so ordered.